**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **C.C. by and through her parents,** | § | |
| **J.C. and G.C.; J.B. b/n/f C.V. and L.B.;** | § | |
| **E.B. b/n/f K.L. and A.B. and** | § | |
| **M.T. b/n/f M.G.** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No.   1:20-cv-00556** |
| | § | |
| **AUSTIN INDEPENDENT SCHOOL** | § | |
| **DISTRICT,** | § | |
| **Defendant.** | § | |

**FIRST ORIGINAL COMPLAINT**

**NOW  COMES**  CC. by and through her parents, J.G. and C.G.; J.B., by and through her

parents and next  friends, C.V. and L.B.; E.B. by and through her parents and next friends K.L. and

A.B. and M.T. by and through his mother and next friend, M.G. (collectively"the Plaintiffs") and

files this their *First Original Complaint* alleging that the Austin Independent School District

(hereinafter referred to "AISD" or the "School District"), violated the various rights of the Plaintiffs

as more specifically pled herein. Plaintiffs reserve the right to replead if new claims and issues arise

upon further development of the facts, as permitted by law. In support thereof Plaintiffs would

respectfully show this Court the following:

**I.  BRIEF INTRODUCTION TO THE CASE**

1.      All the above named children alleged they were victims of sexual assault while a student at

        the Austin Independent School District.  In each case staff never referred the case to the

        School District's Title IX Coordinator once staff knew of the allegations even though federal

        jurisprudence and the District's own policies and procedures required such a referral. As a

matter of course and because of this threshold failure no family member ever received notice of the multitude of rights both they and their child had under Title IX Jurisprudence. Rather than refer cases to the District's Title IX Coordinators for investigation the cases were referred to the Austin Independent School District who did not confirm even one case as a sexual assault.

2.    Moreover, and in any case the School District has an independent duty to investigate allegations of sexual harassment or assault, even if the Police Department finish there own inquiry and they never did so. Last, and worse of all, the School District never provided any student any counseling, psychological services or other remedies in a timely manner, as contemplated by federal jurisprudence on the topic and the School Board's own policies and procedures on the topic, whether sexual harassment is confirmed or not.

3.    Due to the various acts and omissions briefly noted above and all more fully delineated below Plaintiffs bring forth a claim against the Austin Independent School District, that they were victims of discrimination based upon sex and gender, as contemplated by Title IX of the Educational Acts of 1972, 20 U.S.C. sections 1681 through 1688.  They also bring claims based upon violations of their rights to *Due Process* and *Equal Protection*, as contemplated by the 14th Amendment to the United States Constitution,

## II.  <u>JURISDICTION</u>

4.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and 1343 because the matters in controversy arise under the laws of the United States.

## III. <u>VENUE</u>

5.    Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions

giving rise to the Plaintiffs' claims occurred in the Western District of Texas, Austin Division.

## IV. **PARTIES**

6.     Plaintiffs are either minors victims of sexual assault to both, and the privacy issues involved in this matter, each Plaintiff and their parent or representatives are hereby exercising their right to proceed with this matter anonymously.   The need to protect the identity of Plaintiffs will not hinder the defense of this matter, for the facts are well known to the Defendant School District.  When applying a balancing tests to determine whether the privacy requested is required, the surely the protection of those who have been sexually abused is a small temporary inconvenience to the Defendant, as and such the protection of the victims prevail. Further, with the importance of keeping the identity of the victims protected, by extension the identifying information of family members and representatives also must remain private. That being said, upon service and contact with General Counsel with the School District an unredacted copy of this, and all future filings, will be provided.

7.     C.C. lives in Texas and for the time period pertinent to this case was a student at the Austin Independent School District. She lives with her parents, J.C. and G.C. in Burnet County, Texas.

8.     J.B. lives in Texas and for the time period pertinent to this case was a student at the Austin Independent School District. She lives with her parents, C.V. and L.B. in Austin, Travis County, Texas.

9.     E.B. lives in Texas and for the time period pertinent to this case was a student at the Austin Independent School District. She lives with her parents, K.L. and A.B. in Rockwall County,

First Original Complaint                                                                                                          3

Texas.

10.    M.T. lives in Texas and for the time pertinent to this case was a student at the Austin Independent School District. He lives with his mother, M.G. in Round Rock, Williamson County, Texas.

11.    The Austin Independent School District is a school district organized under the laws of the State of Texas. At all times pertinent to  this  case, E.M. was a student  at the Austin Independent School District. They have been served by and through the Superintendent's Office at 1111 W 6th Street, Austin, TX 78703.  Plaintiffs reasonably believe that their the Honorable Ylise Jahnssen, Attorney with the Office Of General Counsel for the School District, will waive services and answer,

## V. <u>HISTORICAL BACKGROUND OF TITLE IX</u>

A.    About Title IX

12.    The Educational Acts of 1972 passed through Congress as Public Law No. 92-318, 86 Stat. 235 (June 23, 1972) and codified at 20 U.S.C. sections 1681 through 1688.  It is commonly known as "Title IX" and states (in part) that:

"No person in the United States shall, on the basis of gender, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."

It is intended to remedy the effects of discrimination based upon sex, gender or gender stereotypes. Moreover it is to assure that a student is not a victim of bullying, harassment, sexual harassment, assault or sexual assault because of their membership in this protected class.

B.    The Operative Law & Regulations

13.   The United States Department of Education ("DOE") promulgated rules to help implement Congress' intent at 34 C.F.R. §106.1, which became effective as early as July1, 1975. From the inception of Title IX the United States Department of Education ("DOE") in their Office for Civil Rights (OCR) issued policy guidance on discriminatory harassment. They did so on discrimination  based upon race (*see* 59 Fed. Reg. 11448 (Mar. 10, 1994) and later regarding harassment based upon sex ["Title IX"] (*see* 62 Fed. Reg. 12034 [Mar. 13, 1997]). So for instance, 34 C.F.R. §106.34; 34 C.F.R Part 100, App. A and B requires public schools to provide female students *equal access* to educational services as compared to their male peers and access to counseling. 34 C.F. R. §106.36.  A School District must have a Title IX Coordinator, 34 C.F. R. §106.8 whose duty it is, among other things, to assure that students and their parents receive notice of their *due process rights* under the statute and its implementing regulations, 34 C.F.R. §106.9 including and especially notice of the District's complaint procedure. 34 C.F. R. §106.9.  During an investigation of a formal Title IX complaint, a district must provide a party whose participation is invited or expected written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings, with sufficient time for the party to prepare to participate. 34 C.F.R. §106.45(b)(5)(v).

C.    Professional Standards Of Care Developed By The Department Of Education

14.   After holding public hearings, the DOE issued policy guidance on discriminatory harassment based upon  sex ["Title IX"]; 62 Fed. Reg. 12034 (1997).  First and foremost, the District must provide the parent notice of their *due process rights* including an explanation of such rights, notice of who the Title IX Coordinator for the District is, how to contact that person,

the grievance procedure itself, the right to get an investigatory report when completed and to appeal the findings, (p. 12038, Col. III; p. 12040, Col. I-II; p. 12043, Col. II; p. 12044, Col. II-III; p. 12045, Col. I-II), as contemplated by Title IX's implementing regulations. Additionally, a School District has a duty to take "immediate and appropriate steps to promptly investigate (p. 12039, Col. III; ;p. 12042 (Col. II-III) ..." the allegations, end any harassment "and prevent harassment from occurring again....  and take steps to remedy (p. 12037) the effects of the harassment" which includes, among other things, to contact the parent." (Exh. A, p. 12042, Col. II-III; p. 12043, Col. III; P. 12044, Col. III).  It made a distinction in what is termed *quid pro quo* sexual harassment by a staff person against a student so that the District is responsible for the effects of the trauma the student experienced, whereby in student-upon-student harassment a District may only be responsible to address the effects will depend on the speed and efficacy of the school's response once it receives notice. (p. 12037, Col. II; 12039, Col. II).

D.    The Department Of Education- Office Of Civil Rights

15.    Early on the United States Department Of Education ("DOE") *Office of Civil Rights* ("OCR") provided guidance to public school district's across the country by issuing what have been called *Dear Colleague Letter.*   They have been so for over twenty years.  Most relevant to this lawsuit they underscore the operating law and implementing regulations noted above. In addition, the OCR reviews the evolving jurisprudence on the topic of sexual harassment including and especially the Supreme Court cases of Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 75 (1992) [applying Title VII principles to teacher upon student sexual harassment at a school]; Gebser v. Lago Vista Independent School District,

524 U.S. 274, 290; 118 S. Ct. 1989; 141 L. Ed. 2d 277 (1998) [addressing teacher upon student sexual harassment and when liability arises because a school district does not address the harassment] and <u>Davis v. Monroe County Board of Education</u>, 526 U.S. 629; 119 S. Ct 1661; 143 L. Ed. 2d 839 (1999) [addressing student upon student sexual harassment] and their progeny.

16.    This *Guidance* makes clear that school personnel must understand their legal obligations to address harassment based upon sex, gender and gender stereotypes. It lists a number of examples of effective actions including, most importantly timely and impartial investigations.  It noted that even if a District referred a case for investigation to a local law enforcement agency, the District had a duty to complete its own inquiry after the police investigation was over.  Additionally, it provided school boards further direction on its specific obligations and reiterated that in completing an investigation the District should review the effect of the sexual harassment on the child's education; the type, frequency and duration of the conduct, the number of individuals involved, the location of incidents and the "totality of the circumstances."   Importantly, the School District is required to provide prompt and effective action, let a family know of the harassment the child was experiencing in a timely manner and provide information about their procedural rights under the regulations including and especially a grievance process.  Last, if a student has been a victim of sexual harassment the school district has a number of potential interventions including the provision of or paying for counseling, working with a tutor and giving the student the opportunity to make up work.  Moreover, an essential part of a school district's duty is to provide ongoing assessment and follow up inquiries, as to the effectiveness or

ineffectiveness, of any remedy actually or attempted to be provided. It reinforced the need for a strong Title IX Compliance Coordinator to assure that the school district followed the various directives developed by the OCR.  Importantly, a School District must provide to parent complaining that their child was a victim of sexual harassment by another student, information of any disciplinary action the School District took against an offending student.

E.     Policies & Procedures Developed By The Austin Independent School District

17.     Based upon the Title IX statute, its implementing regulations and professional guidelines from the DOE Office Of Civil Rights, all in concern with evolving caselaw on the issue the Austin Independent School District has long had and re-authorized policies and procedures related to *Student Welfare* and keeping students free from Discrimination, Harassment &Retaliation based upon sex or gender. In fact, it specifically *cites*  a number of civil cases including those few noted above. It sets out definitions of sexual harassment, information about reporting allegations of bullying and harassment, and their own investigatory procedures. It required that all allegations of bullying and harassment based upon sex or gender *shall* be directed to the School District's Title IX Coordinator, and that the family be given that person's contact information or for their designee. The family also must receive actual notice of their other procedural rights including and especially the investigatory process. The school district's investigation may be delegated by the Title IX Coordinator often to a local School Principal or Vice-Principal.   In any case, it must be completed in a timely manner, usually less than 10 days and a written report must be developed with interim action taken, as appropriate. The report must address whether or not prohibited contact occurred and must be filed with the relevant School District Official and provided to the

parent.  If a student is not satisfied with the outcome of the investigation, they have the right to appeal the decision through the District's grievance procedure or even with the Office of Civil Rights with the U.S. Department of Education.

18.    The School Board Policies, also note a non-exhaustive list of potential corrective actions. First is to notify the parents, take interim action, provide psychological services, counseling or pay for counseling to the victim, a training program for the victim and perpetrator, and a comprehensive education program for the school community. There must also be a system in place to follow-up and determine if new incidents had occurred and effectiveness of those provided. There is also discussion of increasing staff monitoring and assessment of the problem and having the perpetrator execute a stay-away agreement.

## VI.  FACTS ABOUT EACH PLAINTIFF

A.    ABOUT CC. AND THE SEXUAL ASSAULT SHE EXPERIENCED

19.    The Student, C.C., was born on May 26, 2000.

20.    As a freshman, C.C. dated sophomore J.H. in October of 2014.  Harding was a star football and baseball player for Lanier High School. She broke up with him in March 2015 but he would not "let go" and became more and more possessive of C.C. He claimed that he "wanted her back."

21.    During the first week of April 2015, C.C. was participating in extracurricular activities and J.H. waited for her until it ended at about 5:30pm. He texted a friend of C.C.'s to let the friend  know that he wanted to talk to CC. on the second floor of Lanier High School.  C.C. did meet with J.H. who told her that he missed her and "wanted to mess around". C.C. clearly stated that she did not want to.  Nevertheless, J.H. grabbed her arms, forced her into

the men's bathroom, pushed her into a stall, pulled C.C.'s shorts down and sexually assaulted her. C.C. recalls that the assault lasted about ten minutes. It was the first time she ever had sexual intercourse.

22.     Shortly thereafter, and on or about April 20th, she made an outcry about the sexual assault to a friend who reported it to a Lanier High School staff member. That very same day, C.C.'s parents went to Lanier High School to meet with AISD Police Department Officer Sonia Ramirez and Detective Lieutenant Cox. C.C. was interviewed with two video cameras set up recording her. Incident No. 15-001892 was opened after the completion of the interview. The Officers said that they reviewed surveillance video, but they could not find evidence of the assault.   In any case, the pain and memory of the assault proved to be too much for C.C. and she was unable to return to class. Her parents took to a therapy appointment where she was diagnosed with Post-Traumatic Stress Disorder ("PTSD").

23.     On or about April 24th C.C.'s parents took her to Scott & White for STD/HIV pregnancy testing. On or about the 27th her mother spoke with the Child Advocacy Center to set up a forensic interview.  An AISD Police Department ("PD") investigator was contacted by the Child Advocacy Center. The investigator indicated that no forensic interview would be conducted because AISD PD was "closing the case."  On or about April 28, 2015, C.C.'s parents mailed in a Crime Victim Compensation application ("CVC") but the application for assistance was denied because the AISD PD reported their was no crime.  Apparently J.H. alleged the sexual intercourse was consensual and it was viewed by the police as the classic "he said- she said" scenario without any further investigation.

24.     C.C. continues going to therapy to treat her PTSD.  Her doctor's psychology notes reflect that

she suffers from flashbacks that were triggered by other students wearing cologne like J.H.,
overhearing students conversing in the class about sex, and when other students would get
extremely close to her. Her father spoke to staff at the Travis County's District Attorney's
office requesting information about the AISD PD investigation. He was told that the case
was not staffed because the case was not presented by AISD PD. In any case, C.C. and her
family continued to persist and filed an appeal for the Crime Victims Compensation but it
was given no support by the AISD or their Police Department and was again rejected.

25.     The AISD staff never referred the case to the School District's Title IX Coordinator once
staff knew of the allegations. Further, and even though federal jurisprudence and the
District's own policies and procedures required an investigation to ensue after the Police
Department was finished with their investigation that too never occurred. Worse yet, the
AISD never provided C.C. the various remedies to be afforded to her as a victim of sexual
assault as contemplated by federal jurisprudence on the topic and the School Board's own
policies and procedures, whether sexual harassment was confirmed or not.

26.     Due to the omissions and acts of this School District, C.C. still suffers from PTSD and lives
in fear.

B.      ABOUT J.B. AND THE SEXUAL ASSAULT ALLEGED

27.     The Student, J.B. was born on October 16, 2012.

28.     J.B. was enrolled in the Pre-Kindergarten 3 Program at Boone Elementary in AISD for the
2016-2017 academic year. On February 7, 2017, J.B.'s mother, Ms. C.V. dropped her off
her daughter at the Boone Elementary School. She picked her up around 11:00am. Later that
day, J.B. went to use the bathroom at home and began screaming in distress after she sat on

the toilet. Ms. C.V. went to check on J.B. and discovered that her underwear was blood-soaked and discovered severe bruising and bleeding in her genital area. Shortly thereafter, mother called J.B.'s teacher, Lauren Cheaney ("Cheaney") on the direct classroom phone and left an urgent message. As there was no response Ms. C.V. then sent a second urgent message via email and later, another urgent voicemail to the classroom. At about 6:00pm J.B.'s parents decided to take her to Dell Children's Medical Center Emergency Room. While on the way, they drove past Boone Elementary and observed Cheaney's car as the only vehicle present and that her classroom was the only one with the lights on.

29.     J.B. was evaluated by a Trauma Surgeon and was admitted to surgery for treatment of "vaginal trauma", specifically "emergent surgical repair of her vaginal lacerations" and "Sexually Transmitted Infection testing." While under general anesthesia, a *Sexual Assault Nurse Evaluation* ("SANE") was conducted. The SANE kit was then retrieved by AISD Police Department Detective Alex Phillips (Phillips") following the surgical procedure. The Trauma Surgeon then met with her parents and Detective Phillips and verbally told them the diagnosis was sexual assault.

30.     Detective Phillips confronted the Trauma Surgeon and stated, "You have no proof of that". The Trauma Surgeon replied to Detective Phillips that the injury was not consistent with a fall or "straddle injury." Upon discharge the Dell Children's diagnosed J.B. with (1) "sexual assault bodily force by person unknown to victim" and (2) "contusion of vagina and vulva."

31.     At the Dell Children's Detective Phillips opened a case file for J.B.'s report of sexual assault. Detective Phillips admonished J.B.'s parents not to speak to anyone about the reported sexual assault, including Cheaney or even the Austin Police Department. The Detective did

collect J.B.'s bloody panties as evidence and downloaded videos and photographs of her injuries from Ms. C.V.'s cell phone.  A short time later and on or about February 8th, Cheaney was placed on administrative leave.

32.   On February 10th Ms. C.V. attempted to speak with Boone Elementary Principal at the school, but had to leave a written note with an Assistant Principal to call.  Rather, Ms. C.V. later received a phone call from a representative of the Superintendent's Office who stated that they could not discuss the matter as it was under Police Investigation.  On or about February 12th, J.B. completed a forensic interview at the Child Advocacy Center with Detective Philips and a representative of the Travis County District Attorney's office present.

33.   On or about February 15th Ms. C.V. was approached by approximately five mothers of students in Cheaney's class, who all stated that their children had recently stopped using the restroom at Boone Elementary and instead would "hold it" from drop off time to pickup time a sign of sexual assault.  On the next day, Ms. C.V. met with Principal Stevens at the Boone Elementary. Principal Stevens indicated that he was not aware that the allegations were sexual in nature until Ms. C.V. told him and stated that he was simply instructed by AISD Human Resources to place Cheaney on administrative leave.  J.B. identified Cheaney as the person who had touched her inappropriately.

34.   On the February 22nd a mother of J.B.'s classmate contacted her to report that her 3-year old daughter, E.B., was also suddenly expressing some toileting problems and reported inappropriate contact by Cheaney.

35.   On February 28th Detective Phillips called Ms. C.V. and stated that AISD PD had concluded its investigation and did not have enough evidence to pursue charges, and the investigation

was closed.  Shortly thereafter Cheaney was set to return to Boone Elementary.  Neither the AISD or their PD has ever provided a copy of their investigation or any explanation as to their findings related to the alleged sexual assault.  In fact, the case was closed without the Trauma Surgeon's diagnosis and report, J.B.'s surgical records, photographs and videos of her injuries, and collecting her bloody panties as evidence. In fact, the rape kit was never processed and examined by the AISD PD either.

36.  The AISD staff never referred the case to the School District's Title IX Coordinator once staff knew of the allegations.  Further, and even though federal jurisprudence and the District's own policies and procedures required an investigation to ensue after the Police Department was finished with their investigation that too never occurred.  Worse ye, the AISD never provided J.B. the various remedies to be afforded to her as a victim of sexual assault as contemplated by federal jurisprudence on the topic and the School Board's own policies and procedures, whether sexual harassment was confirmed or not.

37.  Due to the omissions and acts of the School District, J.B. suffers from PTSD and Disassociation, and requires therapy.  Additionally, she has had anxiety, a fear of using school restrooms, and will often wait until she is in the comfort of her own home to do so. She continues to have difficulty trusting teachers.

C.    ABOUT E.B. AND THE SEXUAL ASSAULT SHE EXPERIENCED

38.  The Student, E.B., was born on June 14, 2013.   E.B. was also enrolled in the same Pre-Kindergarten 3 Program at Boone Elementary in AISD for the 2016-2017 academic year as was J.B.  On or about February 21, 2017, she made an outcry to her parents while taking a bath. She indicated that staff member Lauren Cheaney "does this in the bathroom" and

proceeded to insert her index and middle fingers into her vagina. A few days later her parents decided to withdraw their daughter from Boone Elementary. She remained at home throughout that school year.

39.    E.B.'s case was investigated in concert by the AISD PD with the same persons as were involved in the case with J.B. and in a like vein, allegations of sexual harassment and assault were ruled out.

40.    Starting in August of 2017 E.B. was re-enrolled at the AISD, attending Mills Elementary School with the Pre-K Four program. Unfortunately she only remained at this school for about ten (10) weeks but had to withdraw because she was not engaging in the educational environment. For instance, she would hide under her desk, she would not speak to the teacher but would send her friend to communicate her needs, she would not go to the bathroom at school but would wait to do so until she came home and during recess, and she would leave the group and wander around by herself.

41.    As in all the cases noted above the AISD staff never referred the case to the School District's Title IX Coordinator once staff knew of the allegations. Further, and even though federal jurisprudence and the District's own policies and procedures required an investigation to ensue after the Police Department was finished with their investigation that too never occurred. Worse yet, the AISD never provided E.B. the various remedies to be afforded to her as a victim of sexual assault as contemplated by federal jurisprudence on the topic and the School Board's own policies and procedures, whether sexual harassment was confirmed or not.

42.    E.B. evidences significant trauma, mental anguish and behavioral problems. The family

eventually moved away from the AISD.

D.     ABOUT M.T. AND THE SEXUAL ASSAULT HE EXPERIENCED

43.     The Student, M.T., was born on June 08, 2009.  He is cognitively impaired and is considered a person with a disability.   On or about November 6, 2014 when he was a mere kindergartner, M.T. was riding with his mother, Ms. M.G. when he initiated a conversation with her regarding her previous warnings of "nobody touching my pipi."  When they got home mother sat down with her son and asked him about what happened at school.  M.T. did not reply and had a hesitant look on his face. She told her son she could tell something was wrong by the look on his face. M.T. then made an outcry to his mother.

44.     According to M.T. a Bernice Hart Elementary School staff member, Arturo Melgoza  whom M.T. refers to as "cafeteria man," was mad because M.T. often drops his milk in the cafeteria. He stated that Melgoza followed M.T. into the restroom and began touching him, pulling back and forth, on his penis and showed mother how Melgoza had touched him. M.T. stated that he asked Melgoza to stop but he persisted and stated that it was punishment for M.T. dropping his milk.   M.G. assured her son that he was right to tell her and that it was wrong for an adult to touch him in that manner. M.T. replied that he felt sad.

45.     Ms. M.G. was referred to the Austin Independent School District Police Department, who took a statement from M.T. and herself.  The AISD Officer told Ms. M.G. he was going to the school, and would contact her later.  Within hours, the AISD Officer contacted Ms. M.G. and told her there was no evidence, thus they were closing the case.

46.     On or about November 9, 2014, M.T. took a shower and began screaming and crying that his penis hurt.  Ms. M.G. immediately took M.T. to St. David's Medical Center Emergency and

reported M.T.'s pain as well as the previous allegations of sexual assault by the Bernice Hart Elementary School staff member Arturo Melgoza.   A St. David's staff member advised Ms. M.G. to make a Child Protective Services report.  Ms. M.G. called CPS immediately and was told a caseworker would return her call in 24-48 hours.  While at the hospital St. David's staff triaged M.T. for complaints of pain in his penis, testicles, and abdomen. M.T.'s diagnosis from St. David's hospital visit included, observation following alleged rape or seduction, unspecified disorder of male genital organs, and fever.

47.    The AISD Detectives asked Ms. M.G. for permission to set up a forensic interview with M.T. at the Child Advocacy Center and she agreed.  In November of 2014 they went there for a forensic interview.  Staff explained to Ms. M.G. that M.T. would be taken into another room with the CPS caseworker, the detective, and a Child Advocate Center employee for the recorded interview.  Ms. M.G. expressed her concern with M.T. feeling comfortable enough to answer questions without her presence, but let the interview continue without her.  M.T. returned to Ms. M.G. a short time later she was told that M.T. told them he was touched by someone, but he gave no description of who it was, so they were closing the case.

48.    The case was closed and Arturo Melgoza still worked at Bernice Hart Elementary School. After the forensic interview, Ms. M.G. spoke with the Principal and Assistant Principal, who both assured her that M.T. was safe and the Arturo Melgoza would not have any contact with M.T.   Nevertheless, on his very first day back to school, M.T. came home and told his mother that the "cafeteria man" said "sorry for touching my pipi." Mother returned to the school to speak with the Principal and Assistant Principal again and was told she would receive a call her after they reviewed the security camera footage.  The Principal called and

stated that it seemed Arturo Melgoza did not approach M.T. M.T. refused to return to school after the second incident with Arturo Melgoza out of fear.

49.    He too left the School District shortly thereafter. He initiated therapy because, and among other things he was fearful of the dark, was unable to sleep due to nightmares, was hyper-vigilance, had increased propensity to be defiant as a result of the sexual assault and could not concentrate on his school work.

50.    The AISD staff never referred the case to the School District's Title IX Coordinator once staff knew of the allegations.  Further, and even though federal jurisprudence and the District's own policies and procedures required an investigation to ensue after the Police Department was finished with their investigation that too never occurred.  Worse yet, the AISD never provided M.T. the various remedies to be afforded to her as a victim of sexual assault as contemplated by federal jurisprudence on the topic and the School Board's own policies and procedures. whether sexual harassment was confirmed or not.

51.    Due to the omissions and acts of the School District, M.T. still suffers from PTSD, and he still lives in fear.

F.    THE FAILURES OF THE SCHOOL DISTRICT

52.    Upon reason and belief, Plaintiffs allege that school officials never reported the outcry of the sexual assault to the District's title IX Coordinator.   Nor did School District Police Force personnel never reported the outcries of the sexual assaults to the District's Title IX Coordinator.  The School District never provided Plaintiffs a person skilled in interviewing a sexual assault victim. The School District never conducted or completed an investigation into the matter pursuant to Title IX jurisprudence or their own school board policies and

procedures.

53.     The School District failed to provide the family notice of their procedural rights, as set forth by the regulations promulgated under the School Board Policies and Procedures, predicated upon Title IX Jurisprudence.  They never provided the families information about who the Title IX or Plaintiffs' rights under Title IX. The School District failed to provide Plaintiffs with a written investigation of the incident.  The School District failed to provide Plaintiffs information regarding their right to file a formal grievance with the School District, the Texas Education Agency or Office of Civil Rights.

54.     The School District failed to convene a meeting to address the needs of the students after they received allegations of each being victims of sexual assault.  The School District failed to provide any of the remedies required under the School Board's own policies and procedures, predicated upon Title IX Jurisprudence  including but not limited to providing a psychological  assessment; school-based counseling services; paying the parent for out-of-pocket expenses for counseling; or social  skills training.

## VI.  STATE ACTION

55.     Plaintiffs re-allege and incorporate by reference the paragraphs stated above as fully stated verbatim herein and all those below, will incorporate by reference, as if fully stated therein, those above it.

56.     The Austin ISD in any and all matters was acting under color of state law when they subject Plaintiffs tot eh wrongs and injuries set forth herein.

## VII.  UNCONSTITUTIONAL UNWRITTEN POLICY, PRACTICES & CUSTOMS

A.     VIOLATIONS OF THE UNITED STATES AND TEXAS CONSTITUTION

57.     Plaintiffs contend that the School District Defendant had a number of written policies and procedures to protect Plaintiffs from exploitation, abuse, sexual harassment and sexual assault while at the Austin Independent School District.  Such policies and procedures are intended to protect their constitutional rights.  These policies and procedures were based upon well-developed and settled federal caselaw, federal rules, directives from federal executive agencies like the *Office of Civil Rights* with the United States Department of Education and School Board Policies and Procedures promulgated thereunder.  As the District implemented such policies and procedures in an unconstitutional manner, effecting Plaintiffs right to life, liberty and the pursuit of happiness, Plaintiffs seek recovery for damages due to such failures and violations pursuant to 42 U.S.C. §1983.

B.     RIGHT TO EQUAL PROTECTION

58.     The United States Constitution provides that no state shall deny any person within its jurisdiction the equal protection of the law.  Equally the Texas Constitution provides that "all free men...have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges." Texas Constitution, art. 1, Section 3.

59.     The acts and omissions of the School District noted above, violated the rights of Plaintiffs pursuant to the *Equal Protection Clause* of the Fourteenth Amendment, for which Plaintiffs seeks recovery for damages pursuant to 42 U.S.C. §1983.

C.     CONSTITUTIONAL RIGHT TO A PUBLIC EDUCATION

60.     Plaintiffs have a cognizable property right in his education pursuant to the Constitution of the United States and Texas, pursuant to Texas Constitution, art. 7.  The School District failed to assure Plaintiffs were able to enjoy such right, and as such, Plaintiff seeks recovery

for damages pursuant to 42 U.S.C. §1983.

D.     FAILURE OF THE SCHOOL DISTRICT TO TRAIN AND SUPERVISE

61.     Additionally and/or alternatively to the above, the Defendant School District has failed to supervise its staff, as to the law, their duties and responsibilities thereunder, and regulations related thereto.  Such failure rises to the level of a violation of the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

62.     In addition, and also in the alternative to the above, this School Board obviously failed to correctly train staff in regard to the laws, regulations and directives as noted above. Such failures, in addition and in the alternative to the above, rise to the level of a separate violation of the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

63.     As we know from the litany of facts noted above, the School District had actual practices and customs in place, that failed and refused to follow the written policies and procedures developed by the School Board, such failures and refusals, rising to the level of deliberate indifference and a violation of the *Due Process Clause* Fourteenth Amendment of the Constitution of the United States, and for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

64.     In a related vein, and also in addition and in the alternative to the above, Administrative Staff with School District had an actual practice and custom of failing to correctly *report* allegations of sexual abuse and assault of students, such acts and omissions injuring Plaintiffs thereby and giving rise to their claim for violation of rights pursuant to the *Due*

*Process Clause* Fourteenth Amendment of the Constitution of the United States, for which they all seek recovery pursuant to 42 U.S.C. §1983.

## VIII.  VIOLATIONS OF TITLE IX

65. Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et seq.*, ("Title IX") specifically notes that a public entity maybe liable under Title IX for discrimination based upon and gender.  The claimant must be a member of a protected class; must be bullied and harassed because of membership in that class; that such bullying and harassment be severe and pervasive, that the School District  be on notice as to the allegations; that it be deliberately indifferent to those allegations and the victim must have experienced a deprivation of educational opportunities and/or a hostile educational environment and other injuries effecting their education.  Plaintiffs easily satisfy all these threshold requirements and seeks recovery accordingly.

## IX.  PROXIMATE CAUSE

66. Plaintiffs incorporate by reference all allegations in the above related paragraphs with the same force and effect as if herein set forth. Each and every, all and singular of the foregoing acts and omissions, on the part of the Austin Independent School District, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages experienced by Plaintiffs, as set forth herein.

## X.  RATIFICATION AND RESPONDEAT SUPERIOR

67. The Austin Independent School District Defendant, ratified the acts, omissions and customs of all school administrators, educators, personnel, staff and agents. As a result, the Defendant is responsible for the acts and omissions of all school administrators, educators, personnel,

First Original Complaint                                                                                                    22

staff and agents.

## XI.  DAMAGES

68.     Plaintiffs incorporate by reference all of the above related paragraphs, as if fully set forth herein.

69.     As a direct and proximate result of the Defendants' conduct, Plaintiffs have suffered injuries and damages, which they may seek compensation for, all within the jurisdictional limits of this court, including but not limited to the following:

a.      Hostile educational environment;

b.      Deprivation of equal access to educational opportunities;

c.      Deprivation of non-educational opportunities at the school;

d.      Aggravation of any pre-existing condition;

e.      Past mental anguish;

f.      Future mental anguish;

g.      Loss of opportunity;

h.      Loss of companionship;

i.      Past medical expenses;

j.      Future medical expenses;

k.      Injury to reputation; and

110.    Parental wages lost or effected due to expending time and energies attending to these incidents.

111.    By reason of the above, the subject of this lawsuit, Plaintiffs have suffered losses and damages in a sum within the jurisdictional limits of the Court and for which this lawsuit is

brought.

## XII.  ATTORNEYS FEES

112.  Plaintiffs incorporate by reference all of the above related paragraphs, as if fully set forth

herein.

113.  It was necessary for Plaintiffs to hire the undersigned attorneys to file this lawsuit. Upon

judgment, Plaintiffs are entitled to an award of attorneys fees and costs pursuant to Title IX

and 42 U.S.C. § 2000d et seq.

## XIII.  EQUITABLE RELIEF

114.  Plaintiffs respectfully requests that the Court order the Defendant School District to:

a.    Thoroughly investigate all potential violations of policies and procedures regarding

student safety, Title IX compliance, and emergency incident reports in regards to

these incidents, and acknowledge any/all violations of these policies and

procedures including any violation of school/district policy, city ordinance,

state/federal law, or any other city/state/federal regulation;

b.    Provide and implement a plan to remedy any problems/concerns/violations identified

above and carry out appropriate employee censure and training;

c.    Review all relevant polices identified above and make changes where appropriate so

that these policies will comply with all local, state and federal laws and regulations

and their own School Board Policies & Procedures;

d.    Adopt and implement an anti-bullying and harassment program that is taught by an

entity outside and not affiliated with the AISD, like the Anti-Defamation League or

the Southern Poverty Law Center;

e.      That for the next three years the District provide for a school-safety coordinator for each Campus, so as to assure that the program is enacted comprehensively;

f.      That the District retain a neutral third party to complete a confidential bullying and harassment assessment for each campus and have that person or entity report back to the President of the School Board and Superintendent so the District may address any issues noted in the assessment;

g.      That staff receive "Diversity training" by a third party to include information about race, nationality, gender and disability stereotypes including implicit and unconscious bias;

h.      That the school provide a marker in the school library, where books and other materials would be made available to students dealing with bullying, harassment, and related emotional concerns and issues related to gender, race, and disability along with common stereotypes that accompany those subjects;

i.      That Anti-bullying month be recognized by the Austin ISD;

j.      That the school district help facilitate the provision of counseling services for students deemed to be at risk;

k.      That the School Board appoint a committee including interested members of the public to address the issues noted herein, report back to the Board and act accordingly and

l.      For any other relief the Court may see fit to prescribe.

## XIV.  <u>DEMAND FOR A JURY TRIAL</u>

115.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues

in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray in the manner and particulars noted above, and in an amount sufficient to fully compensate her for the elements of damages enumerated above, and enter a judgment in an amount sufficient to fully compensate them for the elements of damages enumerated above, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to 42 U.S.C. §1983 and 1988, and 42 U.S.C. §2000d et seq. and Title IX; together with pre and post-judgment interest, and court costs expended herein, as well as the equitable issues noted above; and for such other relief as this Court deems just and proper whether in law or in equity or both.

Respectfully submitted,

Cirkiel & Associates, P.C.

/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
State Bar No.: 00783829
1901 E. Palm Valley Blvd.
Round Rock, Texas, 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]
ATTORNEYS FOR
PLAINTIFFS